The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.



Mary Ann Whipple
United States Bankruptcy Judge
(Successor Judge Docket)

Dated: April 11 2014

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No. 12-35236 |
| | ) | |
| Roy E. Hodge, Jr., | ) | Chapter 7 |
| | ) | |
| **Debtor.** | ) | |
| | ) | **SUCCESSOR JUDGE** |

### MEMORANDUM OF DECISION RE MOTION TO DISMISS

This case is before the court on the United States Trustee's ("the UST") motion to dismiss Debtor Roy E. Hodge, Jr.'s ("Debtor") Chapter 7 case ("Motion") for abuse under 11 U.S.C. § 707(b)(1) and (3) [Doc. # 23] and Debtor's response ("Response") [Doc. #25]. The court held a hearing on the motion that Debtor, his counsel and counsel for the UST attended in person and at which the parties presented testimony and other evidence in support of their respective positions.

The district court has jurisdiction over this Chapter 7 case pursuant to 28 U.S.C. § 1334(a) as a case under Title 11. It has been referred to this court by the district court under its general order of reference. 28 U.S.C. § 157(a); General Order 2012-7 of the United States District Court for the Northern District of Ohio. Proceedings to determine a motion to dismiss a case under § 707(b) are core proceedings that this court may hear and decide. 28 U.S.C. § 157(b)(1), (b)(2)(J) and (O).

Having considered the motion, the response and arguments of counsel and having reviewed the record in this case, for the reasons that follow, the court will grant the UST's motion and dismiss Debtor's

Chapter 7 case unless he converts it to Chapter 13.

## BACKGROUND

Debtor filed a petition for relief under Chapter 7 of the Bankruptcy Code on November 20, 2012, stating that his debts are primarily consumer debts. [UST Ex. 2]. Debtor's Schedule D shows total secured debt in the amount of $281,131.69. Debtor's secured debts include $247,278.19 secured by a mortgage on his home, which he values at $252,000.00, and $33,853.50 secured by a lien on the title of a 2009 Jaguar. [*Id.*]. Debtor has stated an intention to reaffirm the mortgage debt on his home, although he has been actively involved in discussions with the lender, Bank of America, about a loan modification. Debtor also testified that the 2009 Jaguar has since been turned back to the dealer, and he now drives a 2009 Ford Mustang with a much lower monthly payment.

Debtor's bankruptcy schedules show unsecured priority tax debt in the amount of $22,353.36, and he testified that he has a federal tax liability for 2012, as shown on his return, [UST Ex. 3], that has not been paid. Debtor's Schedule F shows unsecured nonpriority debts in the amount of $54,418.24, which consists primarily of student loan debt in the amount of $23,000 and a deficiency balance due on a lease in the amount of $22,324.14. [*Id.*]. There are no payments for student loan debt shown on Debtor's Schedule J. Debtor's Statement of Financial Affairs shows two creditor collection lawsuits, one of which had ripened into a judgment with a substantial wage garnishment of $6,000 occurring in October of 2012. [UST Ex. 2 at p. 2-25].

Debtor is a sales engineer who has been employed by T-Mobile USA, Inc. for ten (10) years.[1] Debtor's job entails selling mobility solutions to state and local governments, mid-market, and enterprise customers. He is paid a salary and commissions. Debtor excels at his job, as his 2012 federal income tax return (married, filing separately) shows adjusted gross income of $134,702.00. [UST Ex. 3]. Debtor also has a small side business doing computer consulting that as recently as 2008 generated annual cash flow of $25,000 to $27,000. Although he is still doing it, it has been much less lucrative since then, generating approximately $1,600 in 2013 that is not reflected on Debtor's Schedule I. [*See* UST Ex. 5].

According to Schedule I and Debtor's testimony at the hearing, Debtor is married and has three children listed as dependants, a daughter and two sons, ages 14, 18, and 11, respectively. [UST Ex. 5, Schedule I]. He has been married to Montalena Allen Hodge for approximately three years. Debtor had a

---

[1] Debtor's Schedule I in his petition filed on November 20, 2012 stated that Debtor has been employed by T-Mobile for 8 years [Doc. # 1], but the current Schedule I [UST Ex. 5, Schedule I] provided for the court at the hearing held on November 13, 2013, states that Debtor has been employed by T-Mobile for 10 years.

2

five year spousal support obligation to his former spouse of $1,500/month that ended in August 2012, an obligation which the court infers contributed to bringing Debtor to his current financial situation. He still pays child support as shown on his Schedule I, an obligation that he testified will not decrease when the children turn 18.

Debtor's current Schedule I ,[UST Ex. 5, Schedule I], shows monthly income (including commissions) of Debtor, less payroll deductions for taxes and Social Security, insurance, a 401-K loan, child support, and a 401-K contribution (3%) totaling $5,804.62, and monthly income of Debtor's spouse, less deductions for taxes and social security, in the amount of $1,475.15, for total monthly net income of $7,279.77.

Debtor's spouse works as a health care navigator for Neighborhood Health Association. She testified that the job is related to the open enrollment period of the Affordable Care Act and thus is only temporary. As of the date of her testimony, she did not expect the position to last any longer than 8 months. She also testified that she is a licensed insurance agent and has sold life insurance in the past. She plans to start up life insurance sales again in the future, but she cannot sell life insurance while she works for her current employer on a full-time basis.

In addition to Debtor's spouse, Debtor also testified to some uncertainty as to the amount of his monthly income in future months. Debtor certified in his testimony that his 2012 adjusted gross income totaled $134,702.00. [UST Ex. 3]. At the time of his testimony in November 2013, he expected his 2013 gross income to be less than his 2012 gross income, although he could not be certain. Debtor's income has not, however, been reduced materially since case filing. Debtor's Schedule I included in his petition listed household monthly net income totaling $7,338.42. [UST Ex. 2 at p.2-21]. Debtor's current Schedule I [UST Ex. 5, Schedule I] listed his net monthly income as $7,279.77, a monthly loss of $58.60. The uncertainty in future monthly and yearly income derives from a change in how Debtor's commissions are being calculated, which Debtor testified would likely result in lower commissions than in prior years. As of October 18, 2013, Debtor had a year to date income of $100,373.00. If commissions shown on the October 18, 2013 earnings statement remain steady, it can be projected that Debtor's own 2013 gross income would be close to $120,000.00. [UST Ex. 5, T-Mobile Earnings Statement].

Debtor's current Schedule J shows total monthly expenses of $7,557.50. [UST Ex. 5, Schedule J]. Those expenses include a mortgage payment of $2,190.50. Debtor testified, however, that he has been involved in loan modification discussions with Bank of America, with neither a denial or an approval having

been determined at the time of filing, and that he has not actually been making the $2,190 monthly mortgage payments to Bank of America, since December 2012 or January 2013. Instead, the funds not used to pay the mortgage had been used on a vacation to Las Vegas, clothes and activities for the children and generating some savings of something less than $10,000 being held in an American Funds mutual account. Because of Debtor's bankruptcy filing, Debtor testified that Bank of America cannot and has not reached out to Debtor directly about the mortgage modification. But Debtor testified to his intention to reach a mortgage modification in the future. Schedule J monthly expenses also include home maintenance in the amount of $200, which includes a lawn care service, charitable contributions in the amount of $100, $250 for disability insurance, a payment plan with the IRS for unpaid income taxes totaling $482, $150 for automobile maintenance, and $300 in monthly debt payments for his spouse.

Debtor's Form B22A calculating the means test shows the family's annualized current monthly income at the time of filing this case as $162,050.40, which is nearly twice the $80,264.00 median family income in Ohio for a household of five. [UST Ex 2, pp.2-28–2-35]. Debtor is thus an above median income debtor under § 707(b). However, after applying the statutory calculation of deductions from income, Debtor's means test calculation shows no presumption of abuse under 11 U.S.C. § 707(b)(2). The UST does not contest that the presumption of abuse does not arise in Debtor's case. The UST's motion to dismiss for abuse is brought only under § 707(b)(3).

## LAW AND ANALYSIS

Where debts are primarily consumer debts, as in this case, the court may, after notice and a hearing, dismiss a Chapter 7 petition "if it finds that the granting of relief would be an abuse of the provisions of [Chapter 7]." 11 U.S.C. § 707(b)(1). Under § 707(b)(3), in determining whether granting relief would be an abuse, the court is required to consider "(A) whether the debtor filed the petition in bad faith; or (B) the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse." 11 U.S.C. § 707(b)(3)(A) and (B). This provision was added by Congress in 2005 as a part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA").

Before BAPCPA, courts considered whether to dismiss a case for "substantial abuse" under § 707(b) based on the "totality of the circumstances." *See, e.g., In re Krohn*, 886 F.2d 123, 126 (6th Cir. 1989); *In re Price*, 353 F.3d 1135, 1139 (9th Cir. 2004). The Sixth Circuit explained that "substantial abuse" could be predicated upon either a lack of honesty or want of need, to be determined by the totality of the circumstances. *Krohn*, 886 F.2d at 126. Congress incorporated this judicially created construct in

4

§ 707(b)(3). Although pre-BAPCPA case law applying these concepts is still helpful in determining abuse under § 707(b)(3), under BAPCPA Congress has lowered the standard for dismissal in changing the test from "substantial abuse" to "abuse." *In re Mestemaker*, 359 B.R. 849, 856 (Bankr. N.D. Ohio 2007).

In this case, the UST does not argue that Debtor filed his petition in bad faith but instead contends that the totality of Debtor's financial circumstances demonstrates that he is not needy and that granting him a discharge would be an abuse of the provisions of Chapter 7. The totality of the circumstances test allows the court to consider both prepetition and postpetition circumstances. *See U.S. Trustee v. Cortez (In re Cortez)*, 457 F.3d 448, 455 (5th Cir. 2006) ("Section 707(b) does not condition dismissal on the *filing* of bankruptcy being [an abuse] but rather on the *granting of relief,* which suggests that in determining whether to dismiss under § 707(b), a court may act on the basis of any development occurring *before* the discharge is granted."); *In re Mestemaker,* 359 B.R. 849, 855-56 (Bankr. N.D. Ohio 2007).

Debtors are "needy" when "[their] financial predicament warrants the discharge of [their] debts" in a Chapter 7 case. *Behlke v. Eisen (In re Behlke)*, 358 F.3d 429, 434 (6th Cir. 2004). Factors relevant to determining whether a debtor is "needy" include the ability to repay debts out of future earnings, which alone may be sufficient to warrant dismissal under some circumstances. *Krohn*, 886 F.2d at 126. Other factors include "whether the debtor enjoys a stable source of future income, whether he is eligible for adjustment of his debts through Chapter 13 of the Bankruptcy Code, whether there are state remedies with the potential to ease his financial predicament, the degree of relief obtainable through private negotiations, and whether his expenses can be reduced significantly without depriving him of adequate food, clothing, shelter and other necessities." *In re Bender*, 373 B.R. 25, 30 (Bankr. E.D. Mich. 2007); *In re Burge,* 377 B.R. 573, 577 (Bankr. N.D. Ohio 2007); *see Krohn*, 886 F.2d at 126. As the movant, the UST carries the overall burden of demonstrating, by at least a preponderance of the evidence, that the Debtor's case should be dismissed. *In re Weixel*, 494 B.R. 895, 901 (B.A.P. 6th Cir. 2013).

Debtor's schedules show that he is eligible to be a debtor under Chapter 13. His secured and unsecured debts are less than the debt limits set in 11 U.S.C. § 109(e), and he has regular income, *see* 11 U.S.C. § 101(30), as it still projects as sufficiently stable based on his earning experience in 2013 notwithstanding the uncertainty as to future amount to which he and Montalena Hodge testified. As an above median income Debtor, the applicable commitment period for any Chapter 13 plan he proposed would be five years. 11U.S.C. § 1325(b)(4)(A)(ii).

In focusing on § 707(b)(3), the UST asserts that Debtor has sufficient disposable income to repay

5

a portion of his unsecured debt out of future earnings, in Chapter 13 or otherwise. The UST argues that funds used to contribute into Debtor's 401(k) retirement plan and to repay a 401(k) loan should be treated as income available to fund a Chapter 13 plan that provides for a ratable distribution of these funds among all creditors. Additionally, the UST asserts that Debtor's current IRS payment plan would lead to additional disposable income if spread out over a sixty month Chapter 13 plan. Finally, "belt-tightening" with regards to Debtor's car maintenance, home maintenance, and transportation would free-up additional disposable income that could be used to fund a Chapter 13 plan to repay Debtor's unsecured creditors. The court agrees.

Debtor's current Schedules I and J [UST Ex. 5, Schedules I and J], before any adjustments are made, show a monthly net income of -$277.73. Schedule I includes several monthly payroll deductions, one for a 401-K loan ($85.37) and another for a 401-K contribution ($313.60). Debtor did not know when the obligation to repay the 401-K loan would end. But the repayment period for 401-K plan loans is generally no longer than five years. 26 U.S.C. § 72(p)(2)(B) (requiring such loans to be repaid within five years unless the loan is used to acquire the participant's principal residence). Thus, additional funds will become available that could be used to fund a Chapter 13 plan as it appears at this point that the loan will be paid off within a Chapter 13 plan's five year applicable commitment period for an above median income debtor. *Seafort v. Burden (In re Seafort)*, 669 F.3d 662 (6th Cir. 2012)(holding that post-petition income freed up after a debtor's 401(k) loans are fully paid is "projected disposable income" that must be paid into a Chapter 13 plan under § 1325(b)). These two monthly deductions total $398.97. Moreover, the Sixth Circuit's view is that the 401-K contribution and loan repayments are impermissible deductions when determining an ability to pay under § 707(b)'s needs-based analysis, regardless of how it works out under Chapter 13. In *In re Glenn*, the court explained:

> When looking to a debtor's 'need' in a § 707(b) action, the Sixth Circuit Court of Appeals has set forth the precedent that, 'a debtor's voluntary remuneration to a retirement account, whether by contribution or the repayment of a loan, cannot be excluded from a debtor's disposable income.' The reasoning for this is straightforward: it would be unfair to the creditors to allow the Debtors in the present case to commit part of their earnings to the payment of their own retirement fund while at the same time paying their creditors less than a 100% dividend.

*In re Glenn*, 345 B.R. at 835, citing *Harshbarger v. Pees* (*In re Harshbarger*), 66 F.3d 775 (6th Cir.1995) and *In re Behlke*, 358 F.3d at 434–35. In this instance, Debtor's Schedules B and C show that he has built up some exempt retirement savings, and he is now only 48 years old. Thus, the court cannot find that the

6

retirement savings contributions are necessary for his maintenance and support. When the $398.97 amount related to the 401-K plan is excluded as a deduction from Debtor's income, his monthly net income is $121.24.

Debtor's Schedule J [UST Ex. 5, Schedule J] lists a payment plan with the IRS, with monthly payments of $482.00 going towards the IRS' total priority claim of $16,860.36. [UST Ex. 2 at pp. 2-12 and 2-22]]. But if the IRS' claim was to be paid over the course of a 60-month Chapter 13 plan, it would require a monthly payment of $281.01, saving Debtor $200.99, which when added to a revised monthly net income would equal $322.23. Even subtracting the $85.37 on account of Debtor's monthly 401-K monthly loan repayment because the present record does not show when the loan would be paid off such that the funds could be re-directed to Chapter 13 plan payments, Debtor's revised monthly net income would be $236.66, which would project to a dividend floor of 26% to Debtor's general unsecured creditor over the five year life of a Chapter 13 plan. The court finds that this amount alone would be a meaningful dividend to unsecured creditors through a Chapter 13 plan such that there is an ability to repay creditors justifying dismissal.

Moreover, the UST claims, and the court agrees to some extent, that Debtor has the ability to create additional monthly net income by means of belt-tightening. [Doc. # 23]. For example, Debtor testified that he has helped pay for his 18 year-old son's college expenses, amounting to "less than $100/month." While Debtor's desire to assist his son while pursuing a degree is laudable, a debtor is not free to do so at the expense of his unsecured creditors. *See U.S. Trustee v. Harrelson*, 323 B.R. 176, 179 (Bankr. W.D. Va. 2005) (finding debtors' budget that included their adult children's college expenses to be unreasonable as they were under no duty to pay for such expenses); *In re Staub,* 256 B.R. 567, 571 (Bankr. M.D. Pa. 2000) (agreeing that "educational expenses for adult children are discretionary, and are not expenses that should be foisted upon a debtor's pre-petition creditors"); *In re Studdard*, 159 B.R. 852, 856 (Bankr. E.D. Ark. 1993) (holding that debtors who have the ability to repay their debts could not continue to fund their children's college tuition and living expenses to the detriment of their creditors). Any amount going to Debtor's son for his college expenses should go to unsecured creditors. And Debtor's testimony at the hearing also convinced the court that the breadth of Debtor's children's activities (French Club, soccer, golf, piano) are the source of hidden expense that, while not scheduled as such, might reasonably be reduced while still leaving them with reasonable options for extracurricular enrichment in trying to strike the delicate balance between what is necessary for maintenance and support and what it is an appropriate expense for

7

unsecured creditors to subsidize. Likewise, reducing home maintenance expenses through eliminating the use of a lawn service is another source of realistic belt-tightening. While the court cannot specifically quantify these expense reductions, the court is confident that some can be made without damaging Debtor's ability to provide for shelter, food, clothing and other basic family needs.[2]

Accordingly, the court finds that, based on these facts, granting Debtor relief under Chapter 7 of the Bankruptcy Code would be an abuse of the provisions of that chapter given the totality of his financial circumstances. *See In re Behlke,* 338 F.3d at 437 (finding *substantial* abuse where debtors had the ability to pay at least a 14% dividend to their unsecured creditors). The Debtor, although experiencing a slight decrease in monthly income, is not needy in the sense of the necessity of relief under Chapter 7 to improve his financial situation st this time. Debtor has the ability to pay a significant portion of his unsecured debt such that granting him a Chapter 7 discharge would be an abuse of those provisions. Pursuant to *In re Krohn,* the UST has shown not only that Debtor has the ability to repay his creditors with a meaningful distribution through a Chapter 13 plan, but also that Debtor enjoys a stable source of future income and can significantly reduce his expenses through belt tightening without deprivation of reasonable expenses for food, shelter, clothing, and other necessities. *In re Krohn*, 886 F.2d at 126-27.

The court makes this finding even knowing of the income uncertainties to which Debtor and his spouse testified at the hearing and the efforts that have been made since the bankruptcy filing to improve the family's financial situation. Notwithstanding Debtor's testimony, his income has not changed materially during the case. Debtor has also the demonstrated ability to make up any income lost from T-Mobile through his consulting business. And while Montalena Hodge's work is temporary, she has obvious job skills, both hard and soft, that leave this court confident in her ability to replace that income when the need arises. Debtor's Chapter 7 filing was understandably driven by a wage garnishment in October 2012, which in the court's view was the product of financial circumstances that built up over time, including a substantial

---

[2]The court does not agree with the UST's argument that Debtor's budget for transportation expenses could also be trimmed to produce additional resources with which to pay unsecured creditors. Debtor has already taken the step of materially reducing his monthly car payment obligation by trading in the 2009 Jaguar. And while Debtor's Schedule J listings of $750 for transportation and $150 for auto maintenance exceed the IRS standards for transportation and operating costs, Debtor has to travel extensively for his work, with his territory now the State of Michigan. He receives a depreciation allowance on his vehicle, but he is not reimbursed for fuel or mileage. And the family's second vehicle, a 2003 Jaguar, which sounds fancy on the face of it, is actually just an unreliable money pit in terms of needed repairs. Clearly, the family needs two motor vehicles.

five year spousal support obligation of $1,500 a month. However, Debtor's spousal support obligation ended just three months before the Chapter 7 filing, which tells the court that without the financial shock of the wage garnishment, Debtor's financial situation was likely to start improving over time on its own. Given his tax debt, there do not appear to be any state court remedies, such as a municipal court trusteeship, that would both stop the garnishment and help him resolve his priority tax and other debt. Chapter 13, however, can accomplish both.

**THEREFORE**, based on all of the foregoing reasons and authorities, good cause appearing,

**IT IS ORDERED IT IS ORDERED** that Debtor is allowed thirty (30) days from the date of this order to file a motion to convert to a Chapter 13 case, absent which the United States Trustee's motion to dismiss [Doc. # 23] will be granted, and this case will be dismissed, by separate order of the court.

###